IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,     )
                                )    Case No.  2:15-cv-11946-GCS-RSW
           Plaintiff,       )
                                )
            v.               )
                                )
JACK V. GIACALONE,         )
                                )
          Defendant.     )
_____)

## UNITED STATES' MOTION FOR INSTALLMENT PAYMENT ORDER AND ANCILLARY RELIEF AND SUPPORTING MEMORANDUM

The United States of America moves this Court pursuant to 28 U.S.C. § 3204 for an order requiring the judgment debtor, Jack V. Giacalone, to make monthly installment payments to the United States in the amount of $3,500, or in such other amount as the Court determines.  These payments will be applied to the judgment debt incurred by Giacalone pursuant to the stipulated judgment [Doc. 8] entered against him on January 4, 2016, in the amount of $450,091.03, plus interest.  With accruals computed to December 31, 2019, Giacalone's judgment debt is in the amount of $537,222.61.

Because of the peculiarities associated with this case (discussed in the accompanying memorandum), the United States also requests ancillary relief, namely, an order requiring Giacalone to produce records of his gambling winnings and losses (and any other earnings) to counsel for the United States on a quarterly basis for the duration of the installment payment order, and allowing the United States to conduct financial discovery on an ongoing basis.

In support of this motion, the United States submits the following exhibits:

Exhibit 1:    Declaration by Steven J. Kovscek;

Exhibit 2:    Demand letter dated October 19, 2017;

Exhibit 3:      Transcript of Jack Giacalone's post-judgment deposition held on August 30, 2018;

Exhibit 4:      Documentation provided to accountant to support Jack Giacalone's 2016 and 2017 federal income tax returns;

Exhibit 5:      Affidavit of Jack Giacalone;

Exhibit 6:      United States' Third Request for Production of Documents;

Exhibit 7:      2018 monthly statements of account;

Exhibit 8:      Monthly statements of account January 2019 – June 2019;

Exhibit 9:      Deposited checks January 2019 – June 2019;

Exhibit 10:     Deposited money orders January 2019 – June 2019;

Exhibit 11:     Second Set of Interrogatories to Judgment Debtor Jack V. Giacalone by Judgment Creditor United States of America;

Exhibit 12:     Jack V. Giacalone's answer to Interrogatory No. 1;

Exhibit 13:     IRS Collection Financial Standards – Michigan – Local Standards: Housing and Utilities;

Exhibit 14:     IRS Collection Financial Standards – Local Standards: Transportation;

Exhibit 15:     IRS Collection Financial Standards – National Standards: Out-of-Pocket Health Care; and

Exhibit 16:     IRS Collection Financial Standards – National Standards: Food, Clothing and Other Items.[1]

The United States also submits the following memorandum in support of its motion.

---

[1] Exhibits 13 through 16 can be found online at https://www.irs.gov/businesses/small-businesses-self-employed/collection-financial-standards.  The guidelines are periodically updated.

## MEMORANDUM

The United States seeks an installment payment order pursuant to 28 U.S.C. § 3204, requiring Jack Giacalone to pay the Government $3,500 per month for application to his judgment debt.  The issues to be considered are:

- whether Giacalone receives substantial nonexempt earnings from self-employment;

- whether Giacalone is concealing substantial earnings;

- how much Giacalone should pay per month; and

- whether Giacalone should be required to periodically disclose his earnings, and the United States permitted to engage in discovery on an ongoing basis.

### FACTS

### *Background*

On January 4, 2016, this Court entered a stipulated judgment [Doc. 8] in favor of the United States and against Jack V. Giacalone, in the amount of $450,091.03, plus interest.  The judgment is for eight years of federal income tax liabilities, namely, for the years 2004 through 2011, inclusive.  With accruals computed to December 31, 2019, Giacalone owes $537,222.61 on the judgment.  [Ex. 1, ¶ 2].

On October 19, 2017, the United States sent Giacalone a demand for payment of the judgment, but Giacalone has paid nothing on the debt.  [Ex. 1, ¶ 2; Ex. 2.]

For the tax years 2004 through 2017, inclusive, Giacalone filed his federal income tax returns annually, but paid none of the tax he reported on those returns.  [Ex. 1, ¶ 4.]  The United States has sought with limited success to obtain information regarding Giacalone's 2018 and 2019 income.  On August 30, 2018, Giacalone testified in a post-judgment deposition that he has made his living by gambling on sports with bookmakers since 1980, and still does so.  [Ex. 3,

3

7:4-21.]  He refused to state whether the betting operations are illegal, citing his Fifth Amendment right not to incriminate himself.  [Ex. 3, 25:15-26:7.]  Giacalone testified that in 2015 he earned $52,000 by gambling, in 2016 his gambling income was $82,000, and in 2017, which he characterized as a "bad year," it was $22,500; he saves his winnings during good years as a reserve against losses.  [Ex. 3, 22:4-12, 29:5-17; Ex. 4.]  He also testified that he pays his expenses in cash whenever possible.  [Ex. 3, 12:15-21.]

Giacalone testified that he keeps track of his gambling winnings and losses in written form, relates the information to his accountant, and then destroys the records because he went to prison for racketeering the last time the United States got hold of his records, which was followed by more prison time for a conspiracy conviction, and then more time after being convicted of aiding and abetting income tax evasion.  [Ex. 3, 22:19-25:10.]  *See also United States v. Hilf et al.,* Case No. 2:91-cr-80044-GEW-6 (E.D. Mich.) *and United States v. Giacalone et al.,* Case No. 2:92-cr-80848-PJD-2 (E.D. Mich.).  Giacalone emphasized that he would not agree to any resolution of his judgment debt that would involve the United States monitoring his income, stating, "I really don't want anybody knowing what I'm doing."  [Ex. 3, 32:17-33:8.]

The United States issued a subpoena to Giacalone's accountant to obtain the information Giacalone provided to the accountant to support the income reported on Giacalone's tax returns. In response, the accountant turned over one page for each of the years 2016 and 2017 with merely a declarative sentence (*e.g.*: "My Gambling Income for 2017 was 22,500") hand-written on a lined sheet of paper without any supporting materials. [Ex. 4.]

The United States also served discovery to Giacalone on September 5, 2018, demanding production of his 2018 gambling records [Doc. 17-4], on the assumption that those records

would still exist in the Fall of 2018 because the time for providing the 2018 tax information to his accountant had not yet passed.[2]  Giacalone ignored the discovery request and the United States filed its third motion to compel [Doc. 17] on November 28, 2018.  In his response, Giacalone for the first time gave an explanation for not producing his 2018 gambling records, stating "those records are no longer in existence."  [Doc. 19, p 3.]  After a hearing held on April 19, 2019,[3] the Court denied the Government's motion to compel, but required Giacalone to provide Government counsel an affidavit no later than April 23, 2019, indicating (1) that he doesn't have the records, (2) why he doesn't have the records, and (3) whether he knows of anyone else who does have the records.  [Doc. 27.]  Giacalone tardily executed an affidavit on May 9, 2019, which does not address the issue of who else might have possession of his gambling records, and blames the loss of his 2018 gambling records on his wife or a household caregiver who he surmises discarded the relevant piece of paper, because they "sometimes tidy things up and throw away items that are left laying around."  [Ex. 5.]  Giacalone has not filed a federal income tax return for 2018, even though the time for doing so has expired.  [Ex. 1 ¶ 5.]

The United States has also encountered resistance from Giacalone regarding information about his 2019 gambling records.  On July 10, 2019, the United States served Giacalone with a request for his gambling records from January 1, 2019 to the present, his 2018 federal income tax return, and for all records substantiating amounts reported on his 2018 return.  [Ex. 6.]

---

[2] Giacalone's practice of destroying his tax records immediately after providing summary information to his accountant for the preparation of his income tax returns is contrary to law. Taxpayers are required to retain records substantiating the information on their tax returns for so long as the records "may become material in the administration of any internal revenue law," and are also required to make these records available for review by Government officials.  26 U.S.C. § 6001; Treas. Reg. § 1.6001-1(a) and (e).  The premature destruction of tax records, if willful, may constitute a crime.  *See* 26 U.S.C. § 7203.
[3] The hearing was originally scheduled for January 10, 2019, but needed to be put off because of a lapse of funding for the Department of Justice.

Giacalone has not even acknowledged the request, and his failure to respond to that discovery is the subject of a pending motion to compel [Doc. 28].

Giacalone has made no estimated federal income tax payments for 2018 or 2019.  [Ex. 1, ¶ 6.]

### *Giacalone's 2018 and 2019 credit union records*

Notwithstanding Giacalone's resistance to producing information about his income in recent years, Giacalone's credit union account records reveal some of his income for 2018 and 2019.  As shown by monthly account statements for 2018 [Ex. 7], monthly deposits into Giacalone's checking account for that year were as follows:

| Month in 2018 | Total Deposits |
|---|---|
| January 2018 | $5,687.09 |
| February 2018 | $5,042.92 |
| March 2018 | $5,542.92 |
| April 2018 | $5,442.92 |
| May 2018 | $7,742.92 |
| June, 2018 | $5,542.92 |
| July 2018 | $5,751.64 |
| August 2018 | $7,118.54 |
| September 2018 | $3,700.00 |
| October 2018 | $6,589.20 |
| November 2018 | $5,633.20 |
| December 2018 | $5,433.20 |
| **Annual Total** | **$69,227.47 = $5,768.95 per month** |

As shown by checking account statements for the first six months of 2019 [Ex. 8], monthly deposits into Giacalone's account for that period of time were as follows:

| Month in 2019 | Total Deposits |
|---|---|
| January 2019 | $5,647.39 |
| February 2019 | $5,367.51 |
| March 2019 | $5,447.40 |
| April 2019 | $6,081.66 |
| May 2019 | $5,381.67 |
| June, 2019 | $5,381.66 |
| **Six-Month Total** | **$33,307.29 = $5,551.21 per month** |

The monthly checking account statements for the first half of 2019 [Ex. 8] show that each month Giacalone receives an ACH deposit for his Social Security retirement benefits in the amount of $2,163.  Later each month, Giacalone makes a larger deposit, which includes a check [Ex. 9] payable to Giacalone's wife, Deborah, as a stipend from the State of Michigan.  [Ex. 3, 39:22-40:9.]  In what may seem at first glance a curious coincidence, Giacalone deposits an additional $1,600 at the same time he deposits his wife's stipend check.  These deposits are as follows:

| Date of 2019 Deposit | Net Amount of Deposit | Deposits by Check to Deborah Giacalone | Additional Deposit |
|---|---|---|---|
| January 30 | $3,184.37 | $1,584.37 | $1,600 |
| February 27 | $3,204.49 | $1,584.37 + $20.12[4] | $1,600 |
| March 29 | $3,184.37 | $1,584.37 | $1,600 |
| April 29 | $3,218.63 | $1,618.63 | $1,600 |
| May 22 | $3,218.63 | $1,618.63 | $1,600 |
| June 25 | $3,218.63 | $1,618.63 | $1,600 |

[Ex. 8.]  Giacalone's additional monthly deposits of $1,600, and other deposits into the checking account during the first half of 2019, appear to have been made, at least in large part, by money orders in $300 denominations.[5]  [Ex 10.]

### *Potential hidden cash hoard or cash income*

The account statements [Ex. 8] show a relatively stable amount for monthly deposits over the course of 18 months, which seems remarkable given the nature of sports betting, and even

---

[4] February 2019 is an exception: the larger deposit is the sum of the check to Giacalone's wife, plus a small check to Giacalone himself [also in Exhibit 9], plus $1,600.
[5] In the absence of deposit slips, the United States has been unable to determine how deposits of money orders in multiples of $300 could result in $1,600 deposits; this may be attributable to Giacalone taking some portion of the money orders in cash.  Also, the United States is unable to determine why the amounts of money orders for any given month sometimes exceeds and sometimes is less than the total amount of non-check and non-ACH deposits for that month; again, this may be attributable to Giacalone cashing out money orders or depositing cash.

more remarkable when considering that Giacalone only bets during football and basketball seasons, *i.e.,* from late August to mid-June.  [Ex. 3, 32:17-34:4.]  Both the stability of deposits into Giacalone's account, and the at-first-glance curious monthly deposits of $1,600 in money orders, are explainable, though, because Giacalone testified that when he wins bets, he only deposits the money in his checking account if he needs to pay an expense through the account, keeping the remainder as a prudent reserve against gambling losses.  [Ex. 3, 29:13-17, 34:9-17.] That is to say, the deposits into Giacalone's checking account do not reflect the full amount of income he is receiving, but instead only reflect the amount of expenses he needs to pay through his checking account.  In addition, Giacalone also testified that he spends $600 per month on food using cash that is not deposited into his checking account.  [Ex. 3, 12:15-21.]

All this suggests that Giacalone may be sitting on a cash hoard, or is receiving cash income that is not deposited into his checking account.[6]  In any event, the United States cannot definitively determine the amount of Giacalone's gambling income because he receives it in cash and is unable or unwilling produce his gambling records.

To determine the extent of Giacalone's cash holdings, the United States on July 10, 2019, served two interrogatories [Ex. 11] to Giacalone, asking for the amount and location of all cash in his possession, custody or control on a date certain, and for the provenance of the money orders he deposited into his checking account: the source of the funds, who purchased the money

---

[6] The difference between a cash hoard from which a taxpayer draws funds to pay expenses, on the one hand, and a bankroll used as a prudent reserve against gambling losses and which is occasionally replenished through winnings, on the other, could be a factor in determining the amount of unreported income a professional gambler is receiving.  *See United States v. Giacalone*, 574 F.2d 328, 331-333 (6th Cir. 1978).  In this tax collection case, the amount of Giacalone's gambling income is important in determining the appropriate monthly payment he should make to the Government.  If he has a cash hoard, of course, that currency would be subject to execution.

orders, and the stores where they were purchased.  As with the document production served on the same date, Giacalone ignored the discovery, and that failure is a subject of the pending motion to compel [Doc. 28].

### *Total household income and resources*

Giacalone's credit union records show average monthly deposits during the first half of 2019 in the amount of $5,551.21, which includes (a) Giacalone's $2,163 Social Security benefit, (b) his wife's $1,618.63 stipend, and (c) Giacalone's deposits from other sources, presumably gambling.  He also testified that he spends at least an additional $600 per month in cash that does not pass through his checking account.  This amounts to $6,151.21.  (The household resources that Giacalone can draw on should include the monthly stipend his wife receives because that money is actually used to support the household [Ex. 3, 40:6-9].)  Subtracting Giacalone's Social Security benefit and his wife's stipend from the total amount yields gambling income of at least $2,369 per month, or $28,435 annually.  Again, this is a minimal figure because it is derived from Giacalone's checking account records, which reflect his expenses, not his income.

Giacalone has resisted disclosing his gambling records, the amount of cash he has on hand, and the source of the money orders he routinely deposits into his checking account.  For that reason, $6,151.21 may be a substantial understatement of the Giacalone household's actual monthly income.  Accordingly, an alternative method of computing household income is necessary.

Giacalone testified (and reported to the IRS) that his gambling income for 2015, 2016, and 2017, was $52,000, $82,000, and $22,500, respectively.  He also testified that 2017, when he reported only $22,500 in gambling income, was a "bad year."  The average for these three years is $52,167 annually, or $4,347 per month in gambling income.  When the monthly gambling

income is added to Giacalone's monthly Social Security benefit of $2,163 and to Deborah

Giacalone's monthly stipend of $1,618, the sum is a **total monthly household income in the**

**amount of $8,128.**

### *Giacalone's expenses*

Giacalone reports monthly expenses for himself and his dependents totaling $5,093, as

follows:

| Item | Amount |
|---|---|
| Food | $  600 |
| Personal care | $  100 |
| Housing & utilities | $4,000 |
| Health ins. premiums | $  173 |
| Vehicle operating costs | $  120 |
| Miscellaneous | $  100 |
| **Total** | **$5,093** |

[Ex. 12.]  Giacalone's reported housing expenses exceed the standard amount ordinarily allowed

for delinquent taxpayers.

The IRS publishes local financial standards for housing and utilities [Ex. 13] and for

transportation [Ex. 14], and national financial standards for out-of-pocket healthcare costs [Ex.

15] and for food, clothing and other items [Ex. 16].  These standards are promulgated

specifically for the purpose of calculating the repayment of delinquent taxes.  The Department of

Justice is not bound by these standards but uses them to evaluate whether expenses are

reasonable.

The IRS guidelines take into consideration the living situation of taxpayers, and so the

application of these standards to this case first requires a closer look at Giacalone's living

situation.  He resides in a house nominally owned by his wife's trust,[7] with his wife Deborah, an

adult son Vito and an adult daughter Chantel.  [Ex. 3, 7:22-10:4.]  Vito Giacalone is unable to

work and receives Social Security disability payments; Jack Giacalone provides housing and

food to his son, but Vito Giacalone pays for his own car.[8]  [*Id.*]  Chantel Giacalone is

permanently disabled and requires full-time care.  [*Id.*]  Deborah Giacalone provides care to

Chantel Giacalone and receives a monthly stipend from the State of Michigan for the care she

provides to her daughter; she does not otherwise earn an income.  [*Id.*; Ex. 3, 39:22-40:9.]

Chantel Giacalone's other needs are provided for by the Chantel Giacalone Trust, which was

funded by donations.  [Ex. 3, 18:13-21:15.]  Giacalone's adult daughter Cache Giacalone, who

does not live in the home, is the trustee of the Chantel Giacalone Trust.  [*Id.*]

A family of four living in Oakland County, Michigan (Giacalone lives in West

Bloomfield) is allowed a maximum of $2,222 per month for housing and utilities under the IRS

guidelines.  [Ex. 13.]  A delinquent taxpayer is allowed a maximum of $508 per month for

ownership costs for one car and, in the Detroit area, $277 for operating costs; but if actual costs

are below these amounts, the delinquent taxpayer is only allowed the actual costs.  [Ex. 14.]

---

[7] In *Deborah Giacalone and Deborah J. Giacalone Revocable Living Trust v. United States*,
Case No. 2:12-cv-13735-GCS-PJK (E.D. Mich.), Giacalone's wife and her trust filed a quiet title
suit against the United States on account of a notice of federal tax lien identifying Deborah
Giacalone and her trust as nominees of the taxpayer, *i.e.,* as merely nominal owners of property
that actually belongs to Jack Giacalone.  The case was settled, and as a result the federal tax liens
attach to a 50% interest in the property, but the United States has agreed not to enforce its liens
against the home until Deborah Giacalone and Chantel Giacalone no longer live there.  The
settlement specifically provides that it does not otherwise affect the Government's right to
collect Jack Giacalone's judgment debt.

[8] In an effort to be conservative, Vito Giacalone's income is not included in our household
income calculation because that money is not used to support the household.  Deborah
Giacalone's stipend, on the other hand, is included in the household income computation because
her stipend is actually used to support the household.  The purpose of ascertaining household
income is to determine what resources Jack Giacalome can draw on to pay his and his
dependents' expenses, as well as the judgment debt.

Giacalone owns his car outright and reports operating costs of only $120 per month.  [Ex. 3, 36:2-19; Ex. 12.]  Delinquent taxpayers over the age of 65 are allowed out-of-pocket health costs in the amount of $114, and those under 65 are allowed $55 [Ex. 15.], which amounts to $169 per month for Giacalone and his wife together.  The allowable monthly expense for a family of four for food, clothing, and other items is $1,786.  [Ex. 16.]  ***Altogether, according to the IRS guidelines, the allowable monthly expenses for Giacalone and his dependents is $4,297.***

The IRS guidelines assume that a delinquent taxpayer will pay his current taxes before paying expenses.  As stated earlier, Giacalone has paid no income taxes since at least 2004, and even he can't remember the last time he paid income taxes.  [Ex. 3, 21:16-20.]  Accordingly, unless Giacalone actually pays current taxes going forward, he should not be allowed an expense for that item.

## ARGUMENT

Congress promulgated the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. §§ 3001 *et seq.*, to provide a comprehensive statutory framework for the collection of debts owed to the United States.  It was meant to improve the Government's speed and efficiency in collecting debts.  H.R. Rep. No. 736, 101st Cong., 2d Sess. (1990 U.S.C.C.A.N. 6630).  The act specifically authorizes a district court to order a judgment debtor to "make specified installment payments to the United States."  28 U.S.C. § 3204.  One purpose of this remedy is to help make the income of self-employed individuals, like Giacalone, accessible to the United States when collecting judgment debts.  *See Schueler v. Rayjas Enterprises, Inc.*, 847 F. Supp. 1147, 1168 (S.D.N.Y. 1994) (including as an appendix a section-by-section analysis of the act.); *see also Chao v. Vidtape, Inc.*, 2004 WL 203008, *2 (E.D.N.Y. 2004).

To obtain an installment payment order, the United States must show that the judgment debtor "is receiving or will receive substantial nonexempt disposable earnings from self-employment that are not subject to garnishment."  28 U.S.C. § 3204(a)(1).  *See Davis v. United States*, 479 Fed. Appx. 601, 603-604 (5th Cir. 2012).  An alternative ground for an installment payment order is where the debtor "is diverting or concealing substantial earnings from any source, or property received in lieu of earnings."  28 U.S.C. § 3204(a)(2).

After concluding that the United States is entitled to an installment payment order, the Court, after a hearing, determines the appropriate amount of the installment payments.  28 U.S.C. § 3204 ("In fixing the amount of the payments, the court shall take into consideration after a hearing, the income, resources, and reasonable requirements of the judgment debtor and the judgment debtor's dependents, any other payments to be made in satisfaction of judgments against the judgment debtor, and the amount due on the judgment in favor of the United States."); *Davis*, 479 Fed. Appx. at 603-604.

### *The United States is entitled to an installment payment order*

The United States is entitled to an installment payment order both because Giacalone is receiving substantial nonexempt disposable earnings from self-employment, and also because he is concealing substantial earnings.

Giacalone's gambling winnings are earnings from self-employment.  The term "earnings" in the FDCPA refers to "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise. . . ."  28 U.S.C. § 3002(6).  Gambling, "when pursued full time, in good faith, and with regularity, to the production of income for a livelihood" is considered a trade or business for the purposes of self-employment.  *Comm'r v. Groetzinger*, 480 U.S. 23, 35-36 (1987).

All of Giacalone's gambling winnings are "disposable earnings." The phrase "disposable earnings" means "that part of earnings remaining after all deductions required by law have been withheld." 28 U.S.C. § 3002(5). Giacalone's gambling winnings may be subject to tax withholding requirements, but only under certain circumstances. *See* 26 U.S.C. § 3402(q). Because of Giacalone's silence about his gambling winnings – where he places his bets, how much his winnings amount to – there is insufficient information to determine whether any part of his winnings is subject to withholding. Accordingly, the Court should conclude that all his winnings are "disposable earnings" within the meaning of the FDCPA.

The phrase "nonexempt disposable earnings" is defined as "25 percent of disposable earnings, subject to section 303 of the Consumer Credit Protection Act." 28 U.S.C. § 3002(9). Section 303 of the Consumer Credit Protection Act is codified at 15 U.S.C. § 1673, and generally limits debt collection garnishments to 25% of disposable earnings. That limitation, however, does not apply when, as here, the debt is for taxes. 15 U.S.C. § 1673(b)(1)(C). Accordingly, all of Giacalone's gambling income is nonexempt disposable earnings from self-employment that are not subject to garnishment.

Giacalone's earnings from self-employed gambling are "substantial" within the meaning of the statute. Giacalone reported gambling income of $52,000 for 2015, $82,000 for 2016, and, in a "bad year," $22,500 for 2017. The full amount of his gambling income for 2018 and 2019 is unknown to the United States because Giacalone has not filed a 2018 federal income tax return and has failed to produce his gambling records. For this reason, the United States has estimated Giacalone's gambling earnings to be the average of those three years, *i.e.,* $52,167 annually, or $4,347 per month. *See Davis v. United States*, 479 Fed. Appx. 601, 604 (5th Cir. 2012) (district court did not abuse its discretion in determining income based on average of three prior years).

14

The term "substantial" is not a defined term, and the United States has not found any cases that analyze or otherwise discuss the criteria of what constitutes "substantial" earnings under the statute.  *See, e.g., United States v. Vanzant*, 2018 WL 3326439 at *3 ($40,330 in nonexempt disposable earnings from self-employment found to be substantial without discussion); *Johnson v. United States*, 2012 WL 506575 at *4 (D. Md. 2012) ($63,787 in self-employment earnings found to be "substantial" without discussion).  In our case, Giacalone's receipt of gambling income is not trivial in amount nor is it an incidental occurrence.  Instead, by his own reckoning, Giacalone has earned his livelihood and supported his family as a professional gambler since 1980, that is, for the last 39 years.  The Court should conclude that Giacalone has substantial earnings from self-employment as a professional gambler.

Moreover, if Giacalone asserts his gambling income is not substantial, he should be precluded from doing so because he testified that his 2018 gambling records were destroyed and has refused to produce his 2019 records.  This Court's power to impose a spoliation sanction arises from "its inherent power to control the judicial process."  *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (citations omitted).  A spoliation sanction is appropriate when: (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense.  *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (citations and quotations omitted).  What constitutes a proper spoliation sanction lies within the broad discretion of the Court, should serve both fairness and punitive functions, and may include an adverse inference of a fact based on the lost or destroyed evidence.  *Adkins*, 554 F.3d at 652-53.

Here, Giacalone plainly had an obligation to preserve his income records. *See* footnote 2, *supra*. Also, it is evident that Giacalone's self-employment earnings records are relevant to a proceeding in which the United States seeks an installment payment order. And finally, a culpable state of mind may include negligence, which is sufficient to support a sanction of an adverse inference. *Beaven*, 622 F.3d at 553-56. Giacalone has provided no reason for failing to produce his 2019 gambling records, and his excuse regarding the 2018 records – somebody threw away his tax records that he left "laying around" – constitutes negligence (assuming it is given any credence). Accordingly, the Court should bar Giacalone from contending that his earnings from self-employment are not substantial.

Because Giacalone is receiving substantial nonexempt disposable earnings from self-employment that are not subject to garnishment, the United States is entitled to an installment payment order. 28 U.S.C. § 3204(a)(1).

The United States is also entitled to an installment payment order on the alternative ground that Giacalone is "concealing substantial earnings." 28 U.S.C. § 3204(a)(2). Specifically, Giacalone has failed to disclose the amount of his gambling winnings or produce his gambling records. The United States has, through its own efforts, found that Giacalone has been depositing $300 money orders into his checking account in amounts tailored to meet his observable expenses. This occurs even during the times of year when he doesn't gamble, suggesting strongly that Giacalone has cash resources he has not disclosed. Giacalone testified that he would not allow the United States to monitor his income, and he has followed through with that promise. His affidavit [Ex. 5] states that he left his 2018 income/gambling records "laying around," and that they must have been thrown out by his wife or housekeeper. This assertion it is not far removed from "the dog ate my homework," which might not be suspicious

but for his other conduct.  His affidavit ignores (contrary to the Court's order [Doc. 27]) any discussion of who else might have those records.  (No one gambles with oneself; there is always a counter-party who could have the records.)  Giacalone simply ignored discovery about his 2019 gambling records.  Altogether, Giacalone's conduct strongly implies an effort to conceal his substantial earnings from gambling.

### *The Court should order Giacalone to pay the United States at least $3,500 per month*

In determining the monthly payment amount, the Court should consider: (1) the judgment debtor's income and resources; (2) the reasonable requirements of the judgment debtor and his dependents; (3) any other payments to be made in satisfaction of judgments against the judgment debtor; and (4) the amount due on the United States' judgment.  28 U.S.C. § 3204(a); *Davis*, 479 Fed. Appx. at 603-604.

**Giacalone's total household income, in the amount of $8,128, should be considered Giacalone's "income and resources" for this purpose.**  This amount includes Giacalone's estimated monthly gambling income of $4,347, his monthly Social Security benefit of $2,163, and his wife Deborah's stipend of $1,618.  It is acceptable to consider a debtor's Social Security benefit as a financial resource available to a debtor to pay preexisting obligations.  *See United States v. Lampien*, 1 Fed. Appx. 528, 531-532, and n. 3 (7th Cir. 2001) (citing *United States v. Eggen*, 984 F.2d 848 (7th Cir. 1993) for proposition that considering Social Security benefit as a resource for restitution payments does not violate anti-alienation provision of 42 U.S.C. § 407(a).).

The reasonable requirements of Giacalone and his dependents, for the purpose of determining the amount of installment payments, should be based on the IRS guidelines, as application of these guidelines would put Giacalone on an equal footing with other delinquent

taxpayers.  Current taxes ordinarily would be an allowable expense, but Giacalone hasn't paid federal income taxes for many years.  Unless Giacalone submits proof that he has *actually* paid current taxes, he should not be allowed an expense for that item.[9]  **Accordingly, the total amount of expenses allowed to Giacalone to meet his reasonable needs and the reasonable needs of his dependents should be $4,297.**

The Court need not consider payments made to satisfy other judgments because Giacalone has not reported any such obligations.

Finally, the Court should consider the sizeable amount due to the United States for the outstanding judgment discussed herein. The total owed on the judgment with accrued interest through December 31, 2019, is $537,222.61.  The judgment in this case is for Giacalone's income taxes for the years 2004 through 2011.  The United States has yet to receive *any* voluntary payments toward this debt which continues to accrue interest, and Giacalone continues to flout his obligation to pay income taxes, as IRS records show that he has also paid nothing towards his federal income tax liabilities for the years 2012 through 2019.

Based on the foregoing, **the Court should order Giacalone to pay the United States at least $3,500 per month for application to his judgment debt until it is paid in full.** This amount is approximately the difference between his total household income and the reasonable requirements of Giaclone and his dependents based on the IRS guidelines for delinquent taxpayers.

---

[9] A provision in an installment order allowing for a reduction in the monthly payment amount equal to the amount of current taxes that Giacalone actually pays, and for which he provides proof of payment, would be appropriate.

***The Court should grant the United States ancillary relief in the form of disclosure requirements for Giacalone and continuing discovery by the United States***

The FDCPA permits the parties to ask the Court to modify an installment payment order based on changed financial circumstances or the discovery of financial resources not previously disclosed by the judgment debtor.  28 U.S.C. § 3204(b).  In such instances, the Court may modify the amount of the payments, alter their frequency, or require full payment.  *Id.*

In light of Giacalone's long-standing determination not to produce his earnings records, the United States requests that he be required to disclose his earnings, including gambling winnings, to counsel for the United States on a quarterly basis.  In addition, the United States requests leave to conduct discovery going forward so as to ensure that the amount and frequency of the installment payments remains appropriate.  The Court has authority to order this ancillary relief pursuant to the All Writs Act, 28 U.S.C. 1651.  *See United States v. New York Telephone*, 434 U.S. 159, 172 (1977) (holding that the All Writs Act authorizes trial courts to issue all writs necessary and appropriate to effectuate orders); *see also* 28 U.S.C. § 3202(a) (granting courts authority to issue any writs necessary or appropriate to enforce remedies provided by the FDCPA.).

CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)(B)

Undersigned counsel for the United States conferred with counsel for Jack Giacalone with respect to this motion on January 6, 2020.  Giacalone does not consent to this motion.

**CONCLUSION**

For the foregoing reasons, the Court should issue an order requiring Jack V. Giacalone to pay at least $3,500 per month to the United States for application to the judgment entered against him in this action, with such payments continuing until the judgment debt is satisfied in full.  The Court should also require Giacalone to disclose his earnings, including gambling winnings, to the United States every quarter for the duration of the installment payment order, and also allow the United States to conduct discovery on an ongoing basis to ensure that the amount of the monthly installment payments is appropriate.

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

 /s/ Philip Doyle
PHILIP DOYLE
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 310
Ben Franklin Station
Washington, D.C.  20044-0683
Telephone: (202) 514-9673
Email: Philip.a.doyle@usdoj.gov

*Attorney for the United States of America*